# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

Argued October 10, 2013         Decided January 22, 2014

No. 12-5158

PUBLIC EMPLOYEES FOR ENVIRONMENTAL RESPONSIBILITY,
APPELLANT

v.

UNITED STATES SECTION, INTERNATIONAL BOUNDARY AND
WATER COMMISSION, U.S. - MEXICO,
APPELLEE

_____

Appeal from the United States District Court
for the District of Columbia
(No. 1:11-cv-00261)

_____

*Paula Dinerstein* argued the cause and filed the briefs for appellant.

*Jane M. Lyons*, Assistant U.S. Attorney, argued the cause for appellee. With her on the brief were *Ronald C. Machen Jr.*, U.S. Attorney, and *R. Craig Lawrence*, Assistant U.S. Attorney. *Marian L. Borum*, Assistant U.S. Attorney, entered an appearance.

Before: KAVANAUGH, *Circuit Judge*, and SENTELLE and RANDOLPH, *Senior Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* KAVANAUGH.

KAVANAUGH, *Circuit Judge*: Throughout the United States, one finds a great deal of critical infrastructure, such as bridges, airports, railroad tracks, dams, and research facilities. Federal agencies possess many documents relating to critical infrastructure. For understandable security reasons, particularly in the wake of the September 11, 2001, attacks on the United States and the threat of future attacks, federal agencies sometimes want to keep that information confidential. At the same time, members of the public sometimes want to review that sensitive information to see what the government is up to and to help ensure that the government is adequately protecting the country from harm. Our task here is to interpret how the Freedom of Information Act balances those competing interests.

For decades, this Court held that agencies could withhold critical infrastructure records under FOIA's Exemption 2, which covers documents "related solely to the internal personnel rules and practices of an agency." 5 U.S.C. § 552(b)(2); *see Crooker v. Bureau of Alcohol, Tobacco & Firearms*, 670 F.2d 1051 (D.C. Cir. 1981). In *Milner v. Department of the Navy*, the Supreme Court ruled that Exemption 2 does not encompass critical infrastructure records because those records do not relate "solely to the internal personnel rules and practices of an agency." 131 S. Ct. 1259, 1262 (2011). In an important concurring opinion, however, Justice Alito explained that Exemption 7, which encompasses certain records compiled for law enforcement purposes, could cover some critical infrastructure records. *Id.* at 1271-73 (Alito, J., concurring).

Public Employees for Environmental Responsibility, known as PEER, is a non-profit organization dedicated to educating the public about the activities of the U.S. Government. PEER wants records related to two dams located on the border between the United States and Mexico, Amistad Dam and Falcon Dam. So PEER submitted a FOIA request to the United States Section of the International Boundary and Water Commission, the federal agency that manages the dams. Citing security concerns, the U.S. Section initially claimed that the records fell within Exemption 2. After the Supreme Court's decision in *Milner*, the U.S. Section changed course, arguing that some requested records were exempt under Exemption 5, some were exempt under Exemption 7(E), and some were exempt under Exemption 7(F). Exemption 5 covers, among other things, agency records that fall within the deliberative process privilege. Exemptions 7(E) and 7(F) cover various kinds of law enforcement records.

First, invoking Exemption 5, the U.S. Section withheld a report about Amistad Dam that had been prepared by a panel of expert advisors. The expert report discusses potential structural deficiencies in the dam's foundation and embankment. Second, invoking Exemption 7(E), the U.S. Section withheld portions of its emergency action plans for Amistad Dam and Falcon Dam. The emergency action plans contain guidelines outlining the steps that law enforcement and emergency personnel should take in response to a failure of the dams. Third, invoking Exemption 7(F), the U.S. Section withheld a set of inundation maps displaying the downstream areas and populations that would be affected if the dams were to break. The District Court upheld the claimed exemptions.

Here, we vacate and remand on Exemption 5 and the expert report because a potentially dispositive factual question is unresolved. We affirm the District Court's judgment as to Exemption 7(E) and the emergency action plans and as to Exemption 7(F) and the inundation maps.

I

The United States Section is one component of the International Boundary and Water Commission, a joint U.S.-Mexico entity created by treaty to implement the two nations' agreements regarding the Rio Grande River. One of the U.S. Section's functions is to manage dams along the river, including Amistad Dam and Falcon Dam.

A non-profit organization known as Public Employees for Environmental Responsibility submitted a FOIA request to the U.S. Section seeking information about Amistad Dam and Falcon Dam. PEER wanted to apprise the public of what it believed to be hazards stemming from the U.S. Section's poor management of the dams.

In response to PEER's request, the U.S. Section released many of the requested records. But the U.S. Section withheld three sets of records. First, the U.S. Section withheld a report about Amistad Dam that had been prepared by a panel of expert advisors. The report discusses potential structural deficiencies in the dam's foundation and embankment. Second, the U.S. Section withheld portions of its emergency action plans for Amistad Dam and Falcon Dam. The emergency action plans contain guidelines outlining the steps that law enforcement and emergency personnel should take in response to a failure of the dams. Third, the U.S. Section withheld a set of inundation maps. The maps display the downstream areas and populations that would be affected if

the dams were to break. The maps also reveal the estimated time it would take floodwater to reach downstream locations and peak flow times at those locations.

After exhausting its administrative remedies, PEER sought judicial review in the U.S. District Court for the District of Columbia. The U.S. Section initially relied primarily on Exemption 2 to justify its withholding of the expert report, emergency action plans, and inundation maps. Shortly after PEER filed suit, the Supreme Court decided *Milner v. Department of the Navy*, 131 S. Ct. 1259 (2011). That decision made clear that Exemption 2 does not cover records relating to critical infrastructure. In response to *Milner*, the U.S. Section invoked new exemptions to justify its withholdings. The agency asserted that the expert report fell within Exemption 5, that the emergency action plans were covered by Exemption 7(E), and that the inundation maps were exempt under Exemption 7(F). The U.S. Section moved for summary judgment on those grounds. PEER cross-moved for summary judgment, contesting the applicability of those exemptions and arguing that the U.S. Section's alleged bad faith precluded reliance on the affidavits submitted in support of the agency's motion.

The District Court granted the U.S. Section's motion for summary judgment. The court ruled that the U.S. Section had conducted an adequate search for the documents requested by PEER, had properly withheld the three sets of records under Exemptions 5 and 7, and had released all segregable material in those records. *See PEER v. USIBWC*, 839 F. Supp. 2d 304 (D.D.C. 2012). PEER timely appealed that decision.[1] We

---

[1] The District Court also concluded that Exemption 6 covered personal contact information within the emergency action plans and

review the District Court's grant of summary judgment de novo. *See CREW v. FEC*, 711 F.3d 180, 184 (D.C. Cir. 2013).

## II

PEER contends that the U.S. Section acted in bad faith when it responded to PEER's FOIA request and that the District Court therefore should not have relied on the U.S. Section's affidavits in granting summary judgment. As evidence of bad faith, PEER points out that the U.S. Section both denied awareness of the expert report in its initial reply to PEER and failed to uncover a set of inundation maps in its initial FOIA search. But an agency's failure to turn up every responsive document in an initial search is not necessarily evidence of bad faith. During a second search prompted by PEER's administrative appeal, the U.S. Section found the expert report and the inundation maps. The agency then quickly notified PEER that it had located the records. Under our precedents, those actions do not suggest that the U.S. Section was acting in bad faith. *See Iturralde v. Comptroller of the Currency*, 315 F.3d 311, 315 (D.C. Cir. 2003); *Meeropol v. Meese*, 790 F.2d 942, 953 (D.C. Cir. 1986).

PEER also seizes on picayune differences in the agency's various submissions to the District Court to contend that the agency intentionally misled that court. PEER's claims on this score totter between the trivial and the speculative. Stated simply, we agree with the District Court that PEER's allegations do not undermine the reliability of the agency's affidavits.

---

that Exemption 5 covered an email related to the emergency action plans. PEER does not challenge either decision on appeal.

### III

On the merits of its FOIA request, PEER first argues that it is entitled to the expert report on structural deficiencies in Amistad Dam. With respect to the expert report, the U.S. Section asserted Exemption 5. That exemption covers "inter-agency or intra-agency memorandums or letters which would not be available by law to a party . . . in litigation with the agency." 5 U.S.C. § 552(b)(5). Exemption 5 incorporates the deliberative process privilege. The expert report is plainly deliberative and pre-decisional and therefore otherwise would fall within the deliberative process privilege, as the District Court concluded. The question is whether it is an "inter-agency or intra-agency" report.

As its reference to "inter-agency" and "intra-agency" records would indicate, Exemption 5 is most often invoked for documents authored by officers or employees of a U.S. government "agency." *See Department of the Interior v. Klamath Water Users Protective Association*, 532 U.S. 1, 8 (2001). For FOIA purposes, the term "agency" is defined to mean, with certain exceptions not relevant here, "each authority of the Government of the United States." 5 U.S.C. §§ 551(1), 552(f)(1). Because Congress defined "agency" to include only authorities of the U.S. Government, "intra-agency" and "inter-agency" are ordinarily read to refer only to documents created by officers or employees within the U.S. Government.

In the District Court, PEER asserted that officials of the Mexican National Water Commission assisted in preparing the expert report. A foreign entity such as the Mexican National Water Commission is of course not an authority of the U.S. Government. Therefore, according to PEER, if

officials of the Mexican agency assisted in preparing the expert report, the expert report would not fall within the terms of Exemption 5 – "inter-agency or intra-agency" – as those terms are ordinarily interpreted.

As the U.S. Section correctly responds, however, this Court has also interpreted the phrase "intra-agency" in Exemption 5 to go beyond the text and include U.S. agency records authored by *non*-agency entities if those records were solicited by a U.S. agency in the course of its deliberative process. *See McKinley v. Board of Governors of the Federal Reserve System*, 647 F.3d 331, 336 (D.C. Cir. 2011). This Court has referred to this as the "consultant corollary" to Exemption 5.

The consultant corollary was addressed by the Supreme Court in *Klamath*. Assuming without deciding that the consultant corollary was valid, the Court held that the corollary would not exempt records that had been created by several Indian tribes and provided to a U.S. agency, the Bureau of Reclamation. *See Klamath*, 532 U.S. at 12. The Court reasoned that the corollary would not apply because the tribes provided the records to the Bureau of Reclamation "with their own . . . interests in mind" and as "self-advocates at the expense of others seeking benefits inadequate to satisfy everyone." *Id.* In the wake of *Klamath*, we have confined the consultant corollary to situations where an outside consultant did not have its own interests in mind. *See McKinley*, 647 F.3d at 336-37.

Here, the U.S. Section argues that even if PEER is correct that the Mexican National Water Commission assisted in preparing the expert report, the Mexican agency did so in order to advise the U.S. Section, not to advance the Mexican

agency's own interests. For that reason, the U.S. Section believes that the expert report falls within the consultant corollary.

PEER disagrees, based on *Klamath*. PEER argues that, like the Indian tribes in *Klamath*, the Mexican National Water Commission is not a mere consultant to a U.S. agency. In PEER's view, foreign government entities may not be characterized as mere consultants to an executive agency of the U.S. Government, at least in this context. Therefore, PEER argues that the consultant corollary cannot apply in this case – and that Exemption 5 does not cover the expert report.

This is a legal issue of first impression. And it would be unnecessary to resolve it if officials of the Mexican National Water Commission did not actually assist in preparing the expert report. The problem is that we do not know if officials of the Mexican National Water Commission actually assisted in preparing the expert report.[2]

If the Mexican agency did not assist in preparing the expert report, the deliberative process privilege – and therefore Exemption 5 – would cover the report.[3] We therefore vacate the District Court's judgment as to Exemption 5 and the expert report and remand for the District Court to determine whether officials of the Mexican agency assisted in preparing the expert report.

---

[2] This factual issue was not resolved in the District Court because the District Court found that Exemption 5 would apply even if the Mexican National Water Commission assisted in preparing the expert report.

[3] If the Mexican agency did assist in preparing the expert report, we take no position at this time on whether the expert report would be covered by the consultant corollary.

IV

We next consider the emergency action plans and the inundation maps. The U.S. Section asserted Exemptions 7(E) and 7(F) to justify its withholding of those records. To fall within any of the exemptions under the umbrella of Exemption 7, a record must have been "compiled for law enforcement purposes." 5 U.S.C. § 552(b)(7). To fall within Exemptions 7(E) and 7(F), release of a record also must threaten a particular harm. Exemption 7(E) covers a record where the record's release "would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law." *Id.* § 552(b)(7)(E). Exemption 7(F) covers a record where the record's release "could reasonably be expected to endanger the life or physical safety of any individual." *Id.* § 552(b)(7)(F).

We conclude that the emergency action plans and the inundation maps were "compiled for law enforcement purposes," the threshold requirement for application of Exemption 7. We also conclude that the release of the records could lead to the harms listed in Exemptions 7(E) and 7(F). Therefore, the U.S. Section permissibly withheld the emergency action plans and the inundation maps.

A

To fall within Exemption 7, documents must first meet a threshold requirement: that the records were "compiled for law enforcement purposes." 5 U.S.C. § 552(b)(7).

The term "law enforcement" in Exemption 7 refers to the act of enforcing the law, both civil and criminal. *See Tax Analysts v. IRS*, 294 F.3d 71, 77 (D.C. Cir. 2002); BLACK'S LAW DICTIONARY 964 (9th ed. 2009) (defining "law enforcement" as the "detection and punishment of violations of the law"). Law enforcement entails more than just investigating and prosecuting individuals *after* a violation of the law. As Justice Alito explained in his important concurrence in *Milner*, the "ordinary understanding of law enforcement includes . . . proactive steps designed to prevent criminal activity and to maintain security." *Milner v. Department of the Navy*, 131 S. Ct. 1259, 1272 (2011) (Alito, J., concurring). "Likewise, steps by law enforcement officers to prevent terrorism surely fulfill 'law enforcement purposes.'" *Id.*

According to the Supreme Court, the term "compiled" in Exemption 7 requires that a document be created, gathered, or used by an agency for law enforcement purposes at some time before the agency invokes the exemption. *See John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 155 (1989). As Justice Alito explained in *Milner*, "federal building plans and related information – which may have been compiled originally for architectural planning or internal purposes – may fall within Exemption 7 if that information is later compiled and given to law enforcement officers for security purposes." *Milner*, 131 S. Ct. at 1273 (Alito, J., concurring). In this case, the U.S. Section therefore needs to establish that the emergency action plans and the inundation maps were created for law enforcement purposes or were later gathered or used for such purposes.

This Court assesses an agency's Exemption 7 claim of a law enforcement purpose in a manner first articulated in *Pratt*

*v. Webster*, 673 F.2d 408 (D.C. Cir. 1982). *See Tax Analysts*, 294 F.3d at 76-79. If the agency's principal function is law enforcement, we are "more deferential" to the agency's claimed purpose for the particular records. *Id.* at 77. If the agency has mixed law enforcement and administrative functions, we will "scrutinize with some skepticism the particular purpose claimed." *Id.* (quoting *Pratt*, 673 F.2d at 418). That said, it is not evident that the *Pratt* formulation adds all that much to the statutory text. What we must initially do in any Exemption 7 case is assess whether the document in question was compiled for law enforcement purposes.

PEER insists that an agency must have some statutory law enforcement *function*, in addition to a law enforcement purpose for the particular records at issue, before the agency can invoke Exemption 7. And PEER claims that the U.S. Section does not have a law enforcement function. That argument is wrong both on the law and on the facts.

On the law: Under the text of Exemption 7, the withheld record must have been compiled for law enforcement *purposes*; the withholding agency need not have statutory law enforcement *functions*. *See* 5 U.S.C. § 552(b)(7). Congress knew how to delimit a FOIA provision based on the functions of the agency involved. *See id.* § 552(b)(7)(D) (referring to records or information compiled by "criminal law enforcement authority"). It chose not to do so here.

And on the facts: The U.S. Section does perform a law enforcement function. The U.S. Section is a part of the Interagency Committee on Dam Safety, which has the statutory duty to establish programs and policies to "enhance dam safety for the protection of human life and property." 33

U.S.C. § 467e. That duty necessarily encompasses security and prevention of criminal or terrorist attacks.

So on both the law and the facts, we reject the "agency function" argument advanced by PEER. In light of the statutory language, we focus instead on whether the emergency action plans and the inundation maps were compiled for law enforcement purposes.

The emergency action plans plainly were created for law enforcement purposes; they describe the security precautions that law enforcement personnel should implement around the dams during emergency conditions. On the facts of this case, it is also apparent that the inundation maps serve security purposes – namely, to assist law enforcement personnel in maintaining order and security during emergency conditions, and to help prevent attacks on dams from occurring in the first place. "Crime prevention and security measures are critical to effective law enforcement as we know it." *Milner*, 131 S. Ct. at 1272 (Alito, J., concurring). In this context, preventing dam attacks and maintaining order and ensuring dam security during dam emergencies qualify as valid law enforcement purposes under the statute. Because the emergency action plans and the inundation maps were created in order to help achieve those purposes, among others, they were "compiled for law enforcement purposes."

In short, the emergency action plans and the inundation maps readily satisfy Exemption 7's threshold "compiled for law enforcement purposes" requirement.

B

Having concluded that the records meet the threshold requirement of Exemption 7, we next address whether the

emergency action plans fall within Exemption 7(E) and whether the inundation maps fall within Exemption 7(F).

1

The U.S. Section asserted Exemption 7(E) to withhold the emergency action plans. Exemption 7(E) covers documents that "would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law." 5 U.S.C. § 552(b)(7)(E).[4]

---

[4] Exemption 7(E) covers "*techniques and procedures* for law enforcement investigations or prosecutions" as well as "*guidelines* for law enforcement investigations or prosecutions." 5 U.S.C. § 552(b)(7)(E) (emphases added). The exemption's final, qualifying clause requires that an agency demonstrate that the disclosure of the records at issue "could reasonably be expected to risk circumvention of the law." *Id.* The "risk circumvention of the law" requirement clearly applies to records containing "guidelines," because the requirement follows directly after the phrase "would disclose guidelines for law enforcement investigations or prosecutions." *Id.* But courts have disagreed over whether the requirement also applies to records containing "techniques and procedures."

This Court has applied the "risk circumvention of the law" requirement both to records containing guidelines and to records containing techniques and procedures. *See, e.g.*, *Blackwell v. FBI*, 646 F.3d 37, 41-42 (D.C. Cir. 2011). By contrast, the Second Circuit has held that the requirement applies only to records containing guidelines. *See Allard K. Lowenstein International Human Rights Project v. Department of Homeland Security*, 626 F.3d 678, 681-82 (2d Cir. 2010).

This case involves records containing guidelines, and thus the "risk circumvention of the law" requirement clearly applies. So

Exemption 7(E)'s requirement that disclosure risk circumvention of the law "sets a relatively low bar for the agency to justify withholding." *Blackwell v. FBI*, 646 F.3d 37, 42 (D.C. Cir. 2011). To clear that relatively low bar, an agency must demonstrate only that release of a document might increase the risk "that a law will be violated or that past violators will escape legal consequences." *Mayer Brown LLP v. IRS*, 562 F.3d 1190, 1193 (D.C. Cir. 2009).

The emergency action plans contain guidelines that inform emergency personnel how to manage a dam failure at Amistad Dam or Falcon Dam from "event detection to termination." J.A. 62, Declaration of Steven Fitten at ¶ 23, *PEER v. USIBWC*, No. 11-cv-00261 (D.D.C. Apr. 11, 2011). Those guidelines describe the surveillance and detection of the cause of an emergency dam failure as well as the process for evaluating the dam failure when the emergency subsides. The guidelines also set forth the security precautions that law enforcement personnel should implement around the dams during emergency conditions. The guidelines therefore describe how law enforcement personnel might investigate the cause of a dam failure. And because such investigations may constitute "law enforcement investigations" when there is suspicion of criminal sabotage or terrorism, we conclude that the emergency action plans contain guidelines "for law enforcement investigations or prosecutions." 5 U.S.C. § 552(b)(7)(E).

As the U.S. Section reasonably explained, disclosing the emergency action plans also "risks circumvention of the law

---

this case does not implicate the difference between this Court and the Second Circuit. And in any event, given the low bar posed by the "risk circumvention of the law" requirement, it is not clear that the difference matters much in practice.

by those who might seek to exact the greatest amount of damage against the public affected by a dam failure or flood event." J.A. 62, Declaration of Steven Fitten at ¶ 23. Terrorists or criminals could use the information in the emergency action plans to thwart rescue operations following a dam failure or to obstruct attempts to investigate the source of such a failure. Disclosure of the emergency action plans would therefore risk circumvention of the law. We uphold the U.S. Section's invocation of Exemption 7(E) as to the emergency action plans.

2

The U.S. Section invoked Exemption 7(F) in order to withhold the inundation maps. Exemption 7(F) covers records that, if disclosed, "could reasonably be expected to endanger the life or physical safety of any individual." 5 U.S.C. § 552(b)(7)(F). That language is very broad. The exemption does not require that a particular kind of individual be at risk of harm; "any individual" will do. Disclosure need not *definitely* endanger life or physical safety; a reasonable expectation of endangerment suffices. *Cf. Mayer Brown LLP v. IRS*, 562 F.3d 1190, 1193 (D.C. Cir. 2009) (Exemption 7(E) similarly broad).

"[I]n the FOIA context, we have consistently deferred to executive affidavits predicting harm to the national security, and have found it unwise to undertake searching judicial review." *Center for National Security Studies v. Department of Justice*, 331 F.3d 918, 927 (D.C. Cir. 2003). The confluence of Exemption 7(F)'s expansive text and our generally deferential posture when we must assess national security harms means that, in Exemption 7(F) cases involving documents relating to critical infrastructure, "it is not difficult

to show that disclosure may 'endanger the life or physical safety of any individual.'" *Milner v. Department of the Navy*, 131 S. Ct. 1259, 1272 (2011) (Alito, J., concurring). Therefore, assuming an agency has met Exemption 7's threshold test, it will ordinarily be able to satisfy Exemption 7(F) for documents relating to critical infrastructure, such as blueprints, maps, and emergency plans.

Here, the inundation maps fall comfortably within Exemption 7(F). As the U.S. Section explained in its declaration, disclosing the maps would give anyone seeking to cause harm "the ability to deduce the zones and populations most affected by dam failure." J.A. 61, Declaration of Steven Fitten at ¶ 22, *PEER v. USIBWC*, No. 11-cv-00261 (D.D.C. Apr. 11, 2011). Terrorists or criminals could use that information to determine whether attacking a dam would be worthwhile, which dam would provide the most attractive target, and what the likely effect of a dam break would be.

The record in this case includes an intelligence alert from the Department of Homeland Security describing an alleged plot by drug traffickers to blow up Falcon Dam. The alert states that traffickers warned some local residents to evacuate in advance of a possible attack on the dam. That record evidence confirms what common sense suggests: The inundation maps, if disclosed, could reasonably be expected to endanger life or physical safety.

To be clear, Exemption 7(F) does not require concrete evidence in every case. The terms "could" and "expected" in Exemption 7(F) evince congressional understanding of the many potential threats posed by the release of sensitive agency information. An agency therefore need only demonstrate that it reasonably estimated that sensitive

information could be misused for nefarious ends. The U.S. Section has done so here.

PEER counters that Exemption 7(F) should not be construed as broadly as its plain text would indicate. As support, PEER cites the Second Circuit's decision in *ACLU v. Department of Defense*, 543 F.3d 59 (2d Cir. 2008), *vacated*, 558 U.S. 1042 (2009), which interpreted the term "any individual" in Exemption 7(F) to require a particularized threat to a discrete population rather than a diffuse risk to an amorphous population. But even if we agreed with the Second Circuit's reading of Exemption 7(F), the Second Circuit itself conveyed that a threat to the population living downstream of a dam would be sufficiently specific to satisfy the exemption. *See id.* at 81-82. In this case, the U.S. Section points to the same kind of potential harm to a similarly circumscribed population, meaning that the U.S. Section would prevail even under the Second Circuit's approach.

In short, the U.S. Section has connected the release of the inundation maps to a reasonable threat of harm to the population downstream of the dams. The inundation maps fall within Exemption 7(F).

\* \* \*

We vacate and remand the judgment of the District Court with respect to its holding on Exemption 5 and affirm the judgment of the District Court with respect to its holdings on Exemptions 7(E) and 7(F).

*So ordered.*